**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Donald STONE, Jr., Defendant-Appellant. No. 16616.**

United States Court of Appeals Seventh Circuit.

Aug. 1, 1968.

Charles F. Robinson, Jr., Yarling, Winter & Tunnell, Indianapolis, Ind., for appellant.

K. Edwin Applegate, U. S. Atty., Daniel P. Byron, Asst. U. S. Atty., Indianapolis, Ind., for appellee.

Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Donald Stone, Jr., appeals from a final judgment entered in the district court on September 15, 1967, following a trial by jury. He was convicted of the robbery of $6,421 on February 21, 1967, from Merchants Bank and Trust Company, a national bank, in Indianapolis, Indiana, in violation of Title 18 U.S.C. § 2113(a), for which he was sentenced to imprisonment for ten years.

There was evidence tending to prove that a robber at that time secured $6,421 from the bank, that he carried a hand gun, wore a ski mask with the mouth sewn shut and the eyes sown nearly shut, full-length coveralls and white work gloves. No eye witness who testified at the trial could categorically identify defendant as the robber.

A 1965 Chevrolet Impala, used by the robber in driving to and from the bank, was stolen from the Twin-Aire Shopping Center, three blocks from the bank and just behind a Marathon Service Station, some time after 8:10 a. m. the day of the robbery. This car was later found in an abandoned condition in an alley two blocks from the bank. Inside it, an FBI agent discovered that the car's ignition switch had been unplugged from its receptacle and that someone had attached, by wires, an alternate 1965 Chevrolet ignition switch, which can be installed in about 30 seconds. By inserting the correct key in such a switch, a car can be started.

Defendant bought such a switch with keys from a local Chevrolet dealer, four days prior to the robbery. He then used a false name and address.

About one-half hour before the robbery, defendant was seen leaving a parked orange-colored pickup truck, which had a silver splotch and two metal cabinets. He walked toward the Marathon Service Station located several blocks from the bank and just in front of the shopping center from where the get-away car was stolen that morning. He was carrying a shopping bag. He used marathon's rest room for about five minutes and was last seen walking toward the parking lot of the shopping center, directly behind the station.

Defendant admitted to FBI agent Swenson that he used and had sole possession of a truck matching the description of the one seen across the street from the service station.

Inside the get-away Impala car, agents found a ski mask matching the description given by the bank employees. The eyes and mouth were sewn nearly shut with strands of blue and black thread. This was a three-ply, cotton thread of the same diameter, color, type and ply as blue and black thread found in the apartment where defendant resided.

Strands of hair found in the ski mask were found to have 15 different identifiable characteristics. These strands exactly matched 15 different identifiable characteristics of defendant's hair.

There were no distinguishing characteristics.[1]

A pair of white work gloves found in the basement of the house of defendant's parents [which house he visited often and on the day prior to the robbery and the day of the robbery] contained debris fibers that had the identical microscopic appearance as the ski mask in evidence, i. e., the size, color of fiber, diameter of fiber, and type were the same.

On the afternoon of the robbery defendant went to his stepmother's house and telephoned his aunt. She came by the house, picked up defendant, who was then carrying a shopping bag, and at his direction drove him by a house which he stated he was planning to buy.

When interviewed by FBI agents three days after the robbery, he volunteered that he was paying traffic tickets at the downtown Indianapolis police station from 9:05 a. m. to some time after 10:00 a. m. Witnesses at the station, however, testified that he arrived there some time around 10:00 a. m. The evidence indicates that he could have traveled from the place where his orange pickup truck was parked across from the service station to the police station in 7½ minutes.

■ 1. Defendant's counsel now urge that on February 22, 1967, while he was confined in the Marion County, Indiana jail, and being held for a probable cause hearing, FBI agents went to the residence of his father and stepmother and requested their permission to search the premises, which was given in writing by the stepmother, whereupon the agents searched the house for three to five hours. Defense counsel in their brief admit that defendant did have free access to the house and that defendant had personal belongings stored in a specific area in the basement. During this search, certain items, including a sales receipt for an ignition system similar to one found in the alleged escape vehicle, were found and later introduced into evidence at the trial. Defendant maintains that the consent was invalid and that therefore the search and seizure was unreasonable and unlawful.

This situation presents an issue as to whether, under all the circumstances, the search, consented to by a person having immediate control and authority over the premises, was reasonable. In United States v. Airdo, 7 Cir., 380 F.2d 103, at 106–107 (1967), cert. denied 389 U.S. 913, 88 S.Ct. 238, 19 L.Ed.2d 260, we said:

> "* * * The considerations most applicable to the third person's consent in such cases are not related to principles of agency connecting the defendant with the person acquiescing in the search, but rather concern the reasonableness, under all the circumstances, of a search consented to by a person having immediate control and authority over the premises or property searched. Cf. Roberts v. United States, 8 Cir., supra 332 F.2d [892] at 896–897. Miss Hilan lived in the apartment and therefore had authority to consent to a search of it. Her consent was voluntary and the search was narrowly confined. Under these circumstances, the inspection of the television set was not an unreasonable search prohibited by the fourth amendment."

Accordingly, we hold that the district court did not commit error in overruling defendant's motion to suppress the evidence obtained by the search after the stepmother in writing granted the agents permission to search the residence of his father and stepmother.

■ 2. Defendant's motion for a judgment of acquittal raises the question as to whether there was sufficient evidence presented by the government to justify the court in submitting the case for decision by the jury. His counsel concedes that it is our duty in reviewing the evidence to draw all reasonable inferences favorable to the government. We have applied this test, which able

---

1. We construe these words to mean a lack of dissimilarity.

counsel on both sides in this case recognize as controlling, and are convinced that the result reached by the district court, based upon the verdict of a jury in a trial remarkably free of error, is supported by such evidence.

For these reasons, the judgment from which this appeal was taken is affirmed.

Judgment affirmed.